NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 230391-U

NO. 4-23-0391

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 13, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Ford County |
| NICHOLAS L. THURMAN, | ) | No. 22CF112 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Matthew J. Fitton, |
| | ) | Judge Presiding. |

JUSTICE ZENOFF delivered the judgment of the court.
Justices Harris and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court affirmed, concluding (1) defendant was not entitled to a new trial based on prosecutorial misconduct, (2) defense counsel was not ineffective for failing to file a motion *in limine* to exclude certain evidence, and (3) the trial court did not abuse its discretion by imposing a 35-year sentence on defendant.

¶ 2    Defendant, Nicholas L. Thurman, appeals from his conviction of one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2022)) and his consequent sentence of 35 years' imprisonment. He contends first that defense counsel was ineffective for failing to object to certain language in the State's closing argument or that the State's use of that language was plain error. He further contends that counsel was ineffective for failing to move to exclude a written statement from the victim. Finally, he argues his 35-year sentence was excessive. We affirm defendant's conviction and sentence.

¶ 3                                    I. BACKGROUND

¶ 4 The State charged defendant in a single-count information. As amended, it alleged that, on June 15, 2022, defendant placed his penis in the mouth of Z.C., who was under the age of 13.

¶ 5 A. The Section 115-10 Motion

¶ 6 Prior to defendant's jury trial, the State filed a motion under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2022)) seeking leave to present (1) testimony by Donna B. that, in September 2022, Z.C. told her that defendant "forced her to remove her clothes, threw her on a couch and forced himself on her" and (2) a recording of a forensic interview conducted by Mary Tewell of the Champaign County Child Advocacy Center (CAC), as well as Tewell's testimony relating to that interview.

¶ 7 During the evidentiary hearing on the State's motion, Donna B. testified that she was Z.C.'s great aunt, foster parent, and prospective adoptive parent; Z.C. had been living with her for three to four years. On September 17, 2022, Z.C. came to Donna in their home when no one else was present. She said that she needed to talk with her about something. Initially, her demeanor was ordinary, but, as she started speaking, she became "distraught." She told Donna that, during the past summer, defendant made her take off her clothes, then pushed her onto a couch and "laid on top of her." Z.C. did not make any further disclosure to Donna. Donna contacted law enforcement.

¶ 8 Mary Tewell testified that she had been a forensic interviewer at the CAC for more than five years. She interviewed Z.C. on September 23, 2022; the interview was recorded. The DVD of the recording was complete and accurate. The recording showed Z.C. handing Tewell something that looked like a letter. Tewell identified a State exhibit as a "note," which Z.C. said she had written and had given to Tewell at the interview.

¶ 9          Defense counsel argued that Z.C.'s statement to Donna B. and the interview with Tewell were insufficiently reliable to be admitted under section 115-10. Counsel did not address the admission of the letter. The trial court ruled that the testimony of Donna and Tewell and the recording of the interview were admissible.

¶ 10                    B. The Evidence at Trial

¶ 11          Z.C. testified she was 11 years old and in sixth grade in the Fisher (Illinois) School District. She lived with Cheri G. (her grandmother), Debbie R. (her aunt), her four siblings, and Donna B. Her only older sibling was her sister, who was 13 years old.

¶ 12          Defendant was a friend of Cheri G.'s. One day during the previous summer, Cheri told Z.C. that defendant was going to take her out to eat. Cheri had called Donna B. at home, but Z.C. answered the phone. Z.C. went to the house of Cheri's friend Anna in Fisher, taking nothing with her except her phone. Defendant was at Anna's house when Z.C. arrived. Z.C. got in defendant's car. He asked her where she wanted to eat, and she said, "McDonald's." They were near the Rantoul, Illinois, McDonald's, but defendant drove them to the McDonald's in Gibson City, Illinois. Z.C. asked for her usual meal, and defendant ordered it, but no food for himself, at the drive-through. They drove to where defendant lived, which was a two-car garage next to a trailer. They entered the garage through a regular door. The garage was set up with a kitchen area, a living area, and an area with boxes. The living area had a television and a couch that Z.C. thought would seat four, a nightstand next to the couch, and a chair.

¶ 13          Defendant watched television while Z.C. ate her meal on the chair. By this time, it was dark outside; lights were on inside the garage. Z.C. expected defendant to take her home. She went to the couch to watch television, seating herself on the side of the couch opposite defendant. She remained there, playing with her phone and watching television, for an interval she could not

estimate. Defendant moved closer to her so that his leg was touching hers. She said nothing to him and continued to watch television.

¶ 14 After a while, defendant told Z.C. to lie down on the couch. She said, "No." He pushed her down and told her to take off her clothing. She refused but was "[s]cared." He undressed her; she tried to resist by sitting. Defendant took his clothing off. He took away her cell phone when she threatened to call "the cops" if he did not "get off" her. He put the phone on the nightstand. Z.C. always wore glasses, but defendant took them from her when he took her phone.

¶ 15 Defendant lay on Z.C. face-to-face with his legs over her arms, immobilizing her. His hands were behind her head. She was thinking, "I want to go home," and she was feeling "[s]cared." He "scooted up" so he was squatting over her, and he put his penis in her mouth. Asked what she was thinking then, Z.C. said, "I was scared and I wanted to go home." Something came out of defendant's penis; Z.C. did not know what it was. Defendant took his penis out of her mouth, and she spat to clear her mouth.

¶ 16 Defendant told Z.C. she could get dressed, which she did. He did not return her phone and did not take her home. Asked how that made her feel, Z.C. said, "Scared." Z.C. spent the night on the chair while defendant slept on the couch. She got her phone but, "[b]ecause [she] was scared," did not call anyone. Eventually, defendant drove her home. During the drive, he told her not to tell anyone what had happened. At first, she did not tell anyone what had happened, but, after a while, she spoke to Donna B. Asked why she did not say anything earlier, she responded, "I was scared," but she also said that she did not know why she had delayed her disclosure.

¶ 17 Z.C. recalled that Donna B. and Cheri G. were present when she wrote the note she took with her to the interview. However, she never showed it to anyone but the interviewer. Z.C.

identified one of the State's exhibits as her note. Asked how she could recognize it, she responded, "I have terrible handwriting and I can't spell."

¶ 18      On cross-examination, Z.C. testified that she was unsure of how long she had known defendant and could not give an estimate. She knew she had met him through Cheri G. at someone else's home. He had never taken her out to eat before.

¶ 19      Z.C. said that, although the lights were on when defendant was undressed, she did not notice "any unusual markings or scars on his body." Asked to estimate how long the "sexual part" or "physical contact" lasted, she stated it lasted until morning.

¶ 20      Z.C. spoke to Donna B. about the incident because she could not "keep secrets and *** couldn't handle it." On the same day she told Donna about defendant's actions, she also told Cheri G. and "[h]er friends" about it. She was adamant that, although she wrote the note when she learned that she was going to the CAC to be interviewed about her disclosure, she had written the note on her own initiative and had not shown it to anyone but the interviewer.

¶ 21      On redirect examination, Z.C. said that defendant had not remained lying on top of her all night, but she had no estimate of how long the contact lasted. When defendant was on top of her, she agreed she was not looking at him. Asked what she was thinking then, Z.C. said, "I want to go home." Despite her fear, she did think about trying to find identifying marks on defendant's body. She believed that, even without her glasses, she could have seen details on defendant's body.

¶ 22      Officer Austin Rosenbaum, a patrolman and investigator with the Gibson City Police Department, testified that he had received a report relating to Z.C.'s disclosure. He determined that defendant was 47 years old and lived in Gibson City. He went to defendant's address to investigate. Two structures were present on the lot: a garage and a "modular home."

The garage had two overhead doors and one walk-in door. The windows in the garage doors were covered with "various items like flags." Although Rosenbaum had viewed the garage interior only from the doorway, his description of the interior was essentially consistent with Z.C.'s. The "modular home" was "jacked up on blocks and other things." Rosenbaum said that this structure, unlike the garage, did not have an electrical connection.

¶ 23     Cheri G. testified that she could pinpoint the date Z.C. went to defendant's home because she remembered it coincided with the June 18, 2022, birthday of Mia, her oldest granddaughter. She was certain about the tie to Mia's birthday because defendant had called her on June 18 to ask if he "could take Mia out to eat and get her something for her birthday." After Mia decided she did not want to go, defendant asked Cheri if he could take Z.C. instead "because he missed her birthday" on May 28. Cheri was at Anna's house when defendant left with Z.C. and was again at Anna's house when he returned the next day. When defendant left with Z.C., a "bunch of kids" were present at Anna's home, but Donna B. was not there.

¶ 24     Donna B. testified after Cheri G. Her testimony was consistent with her testimony at the hearing on the State's section 115-10 motion.

¶ 25     On cross-examination, Donna B. stated that Z.C. had seemed angrier than usual after the incident and before the disclosure. Her anger manifested itself as unusual quick-temperedness. Donna asked Z.C. what was going on, but Z.C. said she did not know. Z.C. seemed calmer after the disclosure.

¶ 26     Tewell testified to introduce and authenticate the recording of her interview of Z.C. at the CAC. The trial court admitted the recording over defense counsel's continuing objection, and the State played the recording for the jury. By agreement of the parties, an identifiable portion of the recording was muted for the jury.

¶ 27        In the recording, Z.C. entered the interview room and, as she sat, took a folded piece of paper from a pocket and held it between her hands. Tewell and Z.C. had an introductory conversation. Tewell then asked Z.C. if she knew why she was at the interview. Z.C. said she did not. Tewell then questioned her about whether she had recently spoken to anyone about something that had happened. Z.C. said, "Yes," and immediately produced the folded piece of paper (which was now pressed between her legs) and handed it to Tewell. Tewell asked whether it would be "okay" if she read the note out loud; Z.C. said, "No." Z.C. then very softly commented that she had to write the note more than once. Tewell, who was off camera, evidently read the note. She then told Z.C. that she wanted to ask questions about the note's contents. Z.C.'s answers were consistent with her testimony but included less detail.

¶ 28        When the recording finished playing, the State asked Tewell whether its exhibit B was the paper Z.C. handed to her during the interview. Tewell recognized it. The State moved for the note's admission, defense counsel "not[ed] the same objection," and the trial court admitted the note. The record does not indicate that the State published the note to the jury.

¶ 29        After the State told the trial court it had no further evidence at that time, defense counsel moved for a directed verdict. The court denied that motion.

¶ 30        Defendant testified. He was 48 years old and had been convicted of two felonies: manufacturing methamphetamine and armed robbery. He had known Cheri G. for 20 years and had known Z.C. since 2020, which was when he was released from prison. The last time he had seen Z.C. before June 18, 2022, was April 18, 2022. In June 2022, he was living in Gibson City. His home was a garage on Bell Street in Gibson City, in which he was living while working on a mobile home he had moved to the site. The garage was "livable," but the running water was in the mobile home.

¶ 31         Defendant said he had occasionally paid Z.C.'s older sister to help him with cleanup in the mobile home. On the day of the older sister's birthday, he was at Anna's house with her and Cheri G. He told the older sister that he would take her to McDonald's and pay her to do painting in the mobile home. She declined. Cheri told him that Z.C. would like to come clean and paint and then called Z.C. Z.C. walked to Anna's house and got in defendant's vehicle. He commented: "I can't recall if Anna was outside or not, but [Cheri] looked at us. I always thought this was odd and said, 'You two go have fun,' and chuckled." He said it was Cheri's idea "for [Z.C.] to come."

¶ 32         Defendant took Z.C. to the drive-through at the Gibson City McDonald's, and they went back to the garage. It was dusk when they left Anna's, and it was almost dark when they got to McDonald's. Defendant pulled his car into the garage. He and Z.C. talked for a while—she was also using her phone. He suggested that she should eat her food, and then he went to watch television. Z.C. wanted to start painting in the mobile home, which, according to defendant "most definitely had electricity ran [*sic*] to it." However, after she finished eating, she sat in the chair near the television and started watching. He told her she could start working whenever she was ready, but she fell asleep in her chair. She spent the rest of the night there. Defendant said that he had talked with Z.C. about the possibility she could stay the night "if it got late." He said Cheri G. and Donna B. were "fine with" this plan. He called Cheri to tell her that Z.C. would be spending the night.

¶ 33         According to defendant, Z.C. remained sleeping until the next morning. He took her home when she was ready. Z.C. commented about falling asleep. Defendant said her falling asleep "was okay" and that he "could *** still take her to Dollar General and she could have a few things." He was planning to give her money because he "thought it was a good gesture with her wanting to make some money."

¶ 34 Defense counsel asked defendant whether anyone had ever made an accusation against him similar to Z.C.'s. Defendant responded: "No, sir. Kids love me. Call me Uncle Nick."

¶ 35 Defendant denied engaging in any sexual activity with Z.C., taking her clothing off, or taking his clothing off.

¶ 36 After an extended sidebar, the State told defendant and the trial court that it had determined defendant's assertion that he had not been the object of accusations similar to Z.C.'s had opened the door to its impeaching defendant with evidence of a charge of attempted predatory criminal sexual assault against him, which was at the preliminary hearing stage. However, the State had made the "strategic decision" to "forego [*sic*] pursuing that line of questioning." The State limited its cross-examination of defendant to a few questions.

¶ 37 C. The Closing Arguments

¶ 38 The State's argument began with a largely straightforward summary of the evidence. When it mentioned Z.C.'s note or letter, it stated: "That letter is People's Exhibit B. You guys will have an opportunity to read that letter. [Z.C.'s] letter, her words, her writing about that terrible event."

¶ 39 The argument began to focus on Z.C.'s initial fear, contrasted with her fearlessness in the courtroom:

> "Yesterday ***, [Z.C.] in this room in front of you; in front of me; and most importantly, in front of the defendant, Mr. Thurman, told him she was no longer scared of him. He would no longer have power over her. [Z.C.] looked right at [defendant], pointed at him, and said that is the man that took away my innocence, my childhood."

¶ 40        The State, using variations on the phrase, " 'I am scared. I just want to go home,' "
as a refrain, further elaborated on the theme of Z.C.'s initial fear and subsequent bravery before
suggesting that the jury should emulate Z.C.'s courage:

> "She was pinned down. She is unable to move under his body weight. In her mind,
> she is scared. She said, 'I just want to go home.'
>
> After laying on top of her for a while, he shifted his body. He was more
> sitting on her, squatting on her. 'I am scared. I just want to go home.' Her arms are
> still pinned at her sides. She can't fight him. She can't overcome him. She is
> thinking, 'I am scared. I just want to go home.' How he reached around the back of
> her head with his hands and pulled her to him. And she is thinking, 'I am scared, I
> just want to go home.'
>
> And then how he put his penis in her mouth. 'I am scared. I just want to go
> home.' It didn't end until [defendant] finished. [Z.C.] sat up here, Ladies and
> Gentlemen. And she didn't have the word, but she described to you that [defendant]
> ejaculated in her mouth. 'I am scared, I just want to go home.' It didn't end until
> something came out of his penis. She didn't have the word for it. Didn't know what
> was going on. But she knows finally he got off of her and told her to get dressed.
>
> [Z.C.] is not scared at all anymore, Ladies and Gentlemen. [Z.C.] showed
> us all how brave an 11-year-old can be when having to face a terrible situation
> which no child should ever have to face.
>
> And now it is up to you, Ladies and Gentlemen. It is up to you to be brave.
> It is up to you to do the right thing."

The State then reviewed the elements of the offense. It closed by returning to the theme of Z.C.'s courage and the need for the jury to emulate that courage: "Ladies and Gentlemen, [Z.C.] was brave yesterday, braver than any child should ever need to be. And, again, it is your turn to show bravery and return a guilty verdict in this matter." Defense counsel did not object to any portion of the State's argument.

¶ 41 Defense counsel commented on the note, implying that its existence cast doubt on Z.C.'s testimony:

> "But *** ask yourself, you know, what transpired to make the need for the written statement that, again, has not been prepared in June like a diary entry, so to speak, shortly after this happens and apparently was not in existence when [Z.C.] spoke to her aunt. But then when she appeared approximately a week later at CAC, then she has this written statement. And, again, I question again the timing of all of that and how that fits into this case from an incident, as I said, allegedly occurs in June until the interview takes place in September."

¶ 42 In its rebuttal, the State compared Z.C.'s credibility with defendant's, pointing out, for instance, that defendant's claim that he was planning to have Z.C. clean or paint for him after dark was implausible, especially given that it was summer and that Rosenbaum testified the trailer did not have electricity.

¶ 43 Approximately 10 minutes into its deliberations, the jury requested to see the note Z.C. gave to Tewell. Defense counsel stated he had no objection, and the trial court sent the exhibit to the jury. In his appeal, defendant argues that the note emphasizes Z.C.'s childish qualities, and we transcribe it as closely as possible:

"Nick said we wear going out to Eat. But he liad to me and starsted to take. My clothes off then. He took his clothes off to and then He. Put his Dick in [illegible due to a strikethrough] mouth and i Said if You Don't get off I was calling [strikethrough] 911 But he took my Phone and [strikethrough] said Good Luck and It was over the Summer. When we where camping in are Back Yeard. That is Whir he trick. My grandmama She DiD know lather tell i told her."

¶ 44    The jury found defendant guilty of the sole count charged.

¶ 45    D. The Posttrial Motion, Sentencing, and the Postsentencing Motion

¶ 46    Defense counsel moved for a new trial alleging, *inter alia*, that the trial court "erred in granting the State's [section] 115-10 motion over Defendant's objection" and "erred when it allowed the testimony of Donna B[.] and Mary Tewell over objection of the Defendant." The motion did not address the admission of Z.C.'s note or any aspect of the State's closing argument. The court denied the motion.

¶ 47    At sentencing, the trial court noted that predatory criminal sexual assault of a child is a Class X felony with a sentencing range of 6 to 60 years' imprisonment, to be served at 85%. Neither party had any correction to the presentencing investigation report.

¶ 48    Donna B. was sworn in as a witness and read a victim impact statement. She stated: "Normal smells and places now unnerve [Z.C.] The smell of gasoline takes her back to the garage. McDonald's is no longer one of her favorite places. She's been called a liar. She's been threatened because she told the truth about what [defendant] did to her."

¶ 49    Defense counsel did not cross-examine Donna B. He presented no evidence in mitigation. Defendant declined to make a statement in allocution.

¶ 50      The State asked for a sentence of 48 years' imprisonment and 3 years' mandatory supervised release (MSR).

¶ 51      The trial court noted that it was considering all statutory factors in aggravation and mitigation. It agreed with the State that it could not consider factors inherent in the offense. It noted that it considered deterrence of others to be a factor it took "seriously," and it discussed at some length the psychological harms of child sexual abuse.

¶ 52      The trial court found it "extremely troubling" that defendant was a family friend but conceded it would not necessarily have been "particularly more comforting" had he not known Z.C. It deemed that defendant had played on Z.C.'s innocence by offering her a chance to make money. It also considered defendant's criminal record, of which it said it had "seen worse," and that he was on MSR when he committed the offense. Thus, it "believe[d] that" a sentence in the range of "6 to 12 years would be inappropriate."

¶ 53      The trial court sentenced defendant to 35 years' imprisonment. It did not specify the term of MSR. The sentencing order, in an apparent error, states that defendant's term of imprisonment is 35 years and 3 months and does not state a term of MSR.

¶ 54      Defense counsel filed a motion for reconsideration of the sentence, asserting that it was excessive in light of the evidence and failed to comply with article I, section 11 of the Illinois Constitution, which provides, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, § 11). The trial court denied the motion, stating that the sentence was "appropriate."

¶ 55      This appeal followed.

¶ 56                                II. ANALYSIS

¶ 57 On appeal, defendant raises three claims. First, the State committed prosecutorial misconduct when it urged the jury to be brave like Z.C. and used variations of " 'I am scared. I just want to go home,' " as a refrain in closing argument. Second, defense counsel was ineffective for failing to file a motion *in limine* to bar the admission of Z.C.'s note. Third, the trial court abused its discretion when it sentenced defendant to 35 years' imprisonment because (1) it did not adequately address the seriousness of the offense and (2) defendant's sentence amounted to a life sentence and therefore failed to comply with the Illinois Constitution's requirement that sentences be determined with the objective of rehabilitating the offender.

¶ 58 A. Prosecutorial Misconduct

¶ 59 Defendant acknowledges he forfeited his arguments about prosecutorial misconduct by failing to raise the issue below. See *People v. Sebby*, 2017 IL 119445, ¶ 48 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion."). Nevertheless, defendant maintains he is entitled to a new trial pursuant to both prongs of the plain error doctrine and because his counsel was ineffective for failing to object to the prosecutor's closing argument. Our review of the record reveals that although the State's closing argument contained some emotional rhetoric, it did not constitute prosecutorial misconduct. Consequently, defendant has not shown a "clear or obvious error" necessary to support a plain error claim (*People v. Moon*, 2022 IL 125959, ¶ 20), and defendant's ineffective assistance claim fails.

¶ 60 "Prosecutors are afforded wide latitude in closing argument." *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007). Nevertheless, there are limits to proper prosecutorial argument:

> "Closing argument must serve a purpose beyond inflaming the emotions of
>
> the jury. [Citations.] A prosecutor cannot use closing argument simply to 'inflame

the passions or develop the prejudices of the jury without throwing any light upon the issues.' [Citation.] Moreover, it is improper for a prosecutor to utilize closing argument to forge an 'us-versus-them' mentality that is inconsistent with the criminal trial principle that a jury fulfills a nonpartisan role, under the presumption that a defendant is innocent until proven guilty. [Citation.]" *Id.* at 128-29.

"Whether the remarks *** constitute error depends, in each case, on the nature and extent of the statements and whether they are probative of [the] defendant's guilt." *People v. Blue*, 189 Ill. 2d 99, 132 (2000). "[C]losing arguments must be viewed in their entirety, and the challenged remarks must be viewed in context." *Wheeler*, 226 Ill. 2d at 122.

¶ 61     Under these principles, "arguments urging a fearless administration of justice or commenting unfavorably on the evils of crime do not constitute error." *Blue*, 189 Ill. 2d at 128-29. On the other hand, arguments suggesting that juries should render their verdicts on behalf of victims are improper. See *id*. at 132 (holding it was improper to argue a "verdict should be a vehicle to vindicate the [victim's] family").

¶ 62     If a defendant preserves the issue for review, a trial court's determination of the propriety of the prosecution's statements in closing argument should not "be disturbed absent a clear abuse of discretion." *Id*. at 128. Here, however, defendant failed to object to the prosecutor's remarks, so he invokes the plain error doctrine. To obtain relief pursuant to the plain error doctrine, a defendant must show that "a clear or obvious error occurred" and that either (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant" or (2) "the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Moon*, 2022 IL 125959, ¶ 20. "The first analytical step under the plain error rule is to determine whether there was a clear or obvious error." *Id.* ¶ 22. An error in

closing argument is clear or obvious where the comment is both "improper and substantially prejudicial." *People v. Williams*, 2022 IL 126918, ¶ 49.

¶ 63        Defendant first focuses on the prosecutor's repeated references to Z.C. being scared and wanting to go home when defendant sexually assaulted her. Case law does not require the State to avoid arguments that evoke emotion or tend to elicit sympathy for the victim. Rather, it requires that arguments "serve a purpose *beyond* inflaming the emotions of the jury." (Emphasis added.) *Wheeler*, 226 Ill. 2d at 129. Further, "colorful" arguments are not inherently objectionable. *People v. Jackson*, 2018 IL App (1st) 150487, ¶ 42. Here, the prosecutor accurately recited Z.C.'s testimony about being scared and wanting to go home. Thus, the prosecutor's remarks were directly tied to the evidence presented at trial. Moreover, the remarks were relevant to a disputed issue, as Z.C.'s fear might help explain why she delayed disclosing the sexual assault. See *Williams*, 2022 IL 126918, ¶ 62 (noting that fear may lead a young victim of sexual assault to delay disclosure). Indeed, during closing arguments, defense counsel cited Z.C.'s delayed disclosure as a reason not to believe her allegations.

¶ 64        Defendant, quoting *People v. Wood*, 341 Ill. App. 3d 599, 615 (2003), accuses the State of " 'filching trial oratory techniques from television melodramas.' " But trial lawyers may borrow their rhetorical *techniques* from whatever source seems suitable to them, be it Cicero or Perry Mason. What they clearly may *not* do is make appeals to emotion divorced from any connection to the evidence in the case. Here, the prosecutor's refrain-like repetition of variants on the phrase, " 'I am scared. I just want to go home,' " was likely designed for emotional effect. Nevertheless, as mentioned above, these words were borrowed directly from the evidence and were relevant to a disputed issue. This distinguishes the matter from *People v. Starks*, 116 Ill. App. 3d 384, 389 (1983), a case defendant cites in which the prosecution crossed the line of permissible

advocacy in multiple ways, including by eliciting and later emphasizing testimony that "cast no light upon the guilt or innocence of the accused."

¶ 65    Defendant also relies on *People v. Littlejohn*, 144 Ill. App. 3d 813, 828 (1986), a case where the appellate court determined the prosecution committed misconduct that "tainted the entire proceeding from beginning to end." One example of misconduct was mentioning in closing argument that the infant murder victim would never get to see her first Christmas or experience other memorable life events. *Id.* at 827. The court explained that such comments were "designed solely to arouse the sympathy and passions of the jurors," as the only disputed issue at trial was whether the defendant was legally insane when he admittedly killed his daughter. *Id.* Here, the prosecutor's remarks about Z.C. being scared and wanting to go home were nothing like the gratuitous and blatantly prejudicial remarks in *Littlejohn*.

¶ 66    Defendant further argues it was misconduct for "the prosecutor [to] implicitly ask[ ] the jury to put itself in Z.C.'s shoes [by] twice [telling] the jury that Z.C. had been 'brave' and it was now 'up to you to be brave.' " Quoting *People v. Spreitzer*, 123 Ill. 2d 1, 38 (1988), a case in which the State asked the jury to imagine the dying moments of the defendant's victims, defendant argues that, because "the State is not free to 'invite the jurors to enter into some sort of empathetic identification with' the victim," the State's encouragement to the jury to emulate Z.C.'s bravery was misconduct. The State, citing *People v. Terrell*, 185 Ill. 2d 467, 512-13 (1998), in which the State talked about the feelings of a 15-month-old girl in her last moments alive, suggests that argument is improper only if it "explicitly ask[s] the jury to place itself in the shoes of the victim."

¶ 67    We conclude that the prosecutor's comments about Z.C.'s bravery were based on the evidence presented and did not exceed the boundaries of permissible argument. The prosecutor was not asking the jurors to put themselves in Z.C.'s shoes. Instead, the prosecutor suggested the

jury should emulate Z.C. or should be as brave as Z.C. This argument, at its core, was one "urging a fearless administration of justice," which is proper. *Blue*, 189 Ill. 2d at 128-29.

¶ 68        Defendant has not demonstrated that a clear or obvious error occurred based on prosecutorial misconduct. Accordingly, he is not entitled to a new trial pursuant to the plain error doctrine. For the same reasons, we must reject defendant's related claim of ineffective assistance of counsel. See *People v. Jackson*, 2020 IL 124112, ¶ 91 (explaining that a defendant could not show "prejudice" for purposes of an ineffective assistance claim where the court had already determined the subject comments did not constitute prosecutorial misconduct under a plain error analysis).

¶ 69                          B. Z.C.'s Note

¶ 70        Defendant next contends his counsel was ineffective for failing to file a motion *in limine* to exclude the note Z.C. gave Tewell at the CAC interview. Defendant emphasizes that Illinois Rule of Evidence 403 (eff. Jan. 1, 2011) authorizes a court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice ***, or by considerations of *** needless presentation of cumulative evidence." Defendant proposes that his counsel should have moved to exclude the note pursuant to Rule 403 because (1) the contents of the note were cumulative of both Z.C.'s testimony and her recorded interview and (2) the note was "written in a child's handwriting, rife with a typical child's spelling mistakes."

¶ 71        "Both the United States and Illinois constitutions guarantee criminal defendants the right to the effective assistance of counsel." *People v. Hale*, 2013 IL 113140, ¶ 15. To establish ineffective assistance of counsel, a defendant must show *both* (1) his counsel's representation fell below an objective standard of reasonableness and (2) the deficient performance of counsel prejudiced defendant. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); see *People v.*

*Albanese*, 104 Ill. 2d 504, 526-27 (1984) (adopting the *Strickland* standard). When an ineffective-assistance claim is raised for the first time on appeal, "our consideration of the issue is equivalent to a *de novo* review." *People v. Jefferson*, 2021 IL App (2d) 190179, ¶ 26.

¶ 72          The *Strickland* standard for deficient performance requires that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689.

> "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.*

¶ 73          Under the second prong of *Strickland*, an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. This is because the "purpose of the Sixth Amendment [(U.S. Const., amend. VI)] guarantee of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." *Id.* at 691-92. *Strickland* therefore requires a defendant to show a reasonable probability that counsel's errors affected the outcome of the proceeding. See *id.* at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.").

¶ 74      We hold that defendant has failed to meet either of *Strickland*'s requirements. Defense counsel did not perform deficiently by failing to file a motion *in limine* to exclude Z.C.'s note. This court has explained that section 115-10 of the Code is an exception to the general rule prohibiting the use of prior consistent statements as substantive evidence. *People v. Applewhite*, 2016 IL App (4th) 140558, ¶ 63. Nevertheless, defendant proposes there is a difference between multiple witnesses testifying to the same victim's statements (something that case law interpreting section 115-10 allows) and using "a third form of the same testimony from the same witness" (*i.e.*, the victim's testimony, her statements in a recorded interview, and her statements in a written note). Defendant seems to be drawing a distinction without a difference. At any rate, we cannot say that defense counsel acted "outside the wide range of professionally competent assistance" (*Strickland*, 466 U.S. at 690) by failing to raise this argument to the trial court.

¶ 75      Defendant also has not satisfied the "prejudice" prong of *Strickland*. Even if defense counsel had raised this argument below and the trial court had accepted it, we discern no reasonable probability that the exclusion of the note could have changed the outcome of the proceeding. The jury was already able to infer the content of the note from the video of the interview; Tewell's questions directly implied its content. Thus, admitting the note itself did not result in new information being submitted to the jury. Defendant argues that the note was unduly prejudicial because the childish handwriting and spelling emphasized Z.C.'s childishness. But the jury was aware of Z.C.'s age and observed her demeanor both on the witness stand and at the CAC interview. The impressions the jury formed of her maturity and the truth of her accusations against defendant would have been unlikely to change simply because the note showed that she struggled with spelling and handwriting. This is especially so given that Z.C. matter-of-factly testified, "I

have terrible handwriting and I can't spell." Defendant's ineffective assistance claim therefore fails.

¶ 76                                    C. Excessive Sentence Claim

¶ 77        Defendant finally asserts his sentence was excessive and inconsistent with the constitutional objective of rehabilitating offenders. He argues his 35-year sentence was a "*de facto* life sentence*" imposed "without any finding that [he] was beyond rehabilitation" and without regard for his rehabilitative potential. According to defendant, this violated Illinois's constitutional directive that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship" (Ill. Const. 1970, art. I, § 11).

¶ 78        As a rule, "absent an abuse of discretion by the trial court, the sentence may not be altered on review." *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). A "sentence within statutory limits will be deemed excessive and the result of an abuse of discretion by the trial court where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.* at 210. "[T]he trial court's sentencing decision is entitled to great deference" because that court, unlike a reviewing court, has "the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.* at 209. "Consequently, the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *Id.*

¶ 79        The Unified Code of Corrections (730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2022)) sets forth mitigating and aggravating factors that the trial court must consider when determining an appropriate sentence. *People v. Brunner*, 2012 IL App (4th) 100708, ¶¶ 43-45. A reviewing court will presume that the trial court considered all relevant factors and any mitigating evidence presented. *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48.

¶ 80   Defendant contends that the trial court failed to give reasonable weight to his relatively advanced age and thus failed to consider Illinois's constitutional objective of "restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Based on the Illinois Department of Corrections' projected release date for him, he calculates he will be 77 years old when he is released. He states that this is older than a general-population prisoner's life expectancy of 64, as discussed in *People v. Sanders*, 2016 IL App (1st) 121732-B, ¶ 26. He therefore argues that his sentence amounts to a "*de facto* life sentence" and that a life sentence is disproportionate to the seriousness of the offense. He suggests "it was possible for the trial court to fashion a sentence for [him] that was neither a *de facto* life sentence, nor the 6- or 12-year sentences that the court characterized as 'inappropriate.' " He suggests an 18-year sentence is appropriate because it falls into that range.

¶ 81   Defendant's argument in support of his excessive sentencing claim is flawed. A trial court has discretion to determine which of the four purposes of sentencing—retribution, deterrence, incapacitation, and rehabilitation—predominate in a given case. *People v. Page*, 2022 IL App (4th) 210374, ¶ 52. Thus, there is no requirement for a court to elevate the goal of rehabilitation over other sentencing goals. Additionally, "*de facto* life sentence" is a term of art relevant to eighth amendment (U.S. Const., amend. VIII) jurisprudence relating to juvenile offenders. See *People v. Wilson*, 2023 IL 127666, ¶ 31 (noting that a *de facto* life sentence is 40 years or more in prison). Where the circumstances of a case justify a lengthy prison sentence, there is no requirement for a court to sentence an older offender to a lesser term in prison than a younger offender would deserve. Defendant seems to be arguing that unless an offense merits a life sentence, a court must fashion a prison sentence that is within the defendant's life expectancy.

Defendant fails to cite any cases supporting this proposition. A person's advanced age at the time of committing a criminal offense is not inherently a mitigating sentencing factor.

¶ 82    Defendant cites federal authority suggesting that trial courts *may* consider that public policy concerns weigh against sentences that will add to the population of elderly prisoners. See *United States v. Craig*, 703 F.3d 1001, 1002-04 (7th Cir. 2012) (Posner, J., concurring). We do not doubt that the cost of incarcerating prisoners increases rapidly as they enter their last years. However, no authority exists holding that a court *must* weigh this effect, let alone prioritize this effect over other relevant sentencing factors, when imposing a sentence.

¶ 83    Defendant faced a sentence of between 6 and 60 years in prison. Given his background and the circumstances of the offense, we cannot conclude that a 35-year sentence was either "greatly at variance with the spirit and purpose of the law" or "manifestly disproportionate to the nature of the offense." *Stacey*, 193 Ill. 2d at 210. Accordingly, we hold that the sentence does not constitute an abuse of discretion.

¶ 84                                III. CONCLUSION

¶ 85    For the reasons stated, we affirm defendant's conviction and sentence.

¶ 86    Affirmed.